UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

DANIEL DERVAN SIMPSON,

Plaintiff,

-v-

THE TOWN OF WARWICK POLICE DEPARTMENT,
DETECTIVE GARY SISCO, and DETECTIVE MARY
MASLANKA,

Defendants.

------------------------------------------------------------------X

13 Civ. 2854 (PAE)

OPINION & ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/9/16

PAUL A. ENGELMAYER, District Judge:

This case stems from the issuance of an arrest warrant for Daniel Dervan Simpson in

February 2003 on charges of petit larceny and third-degree robbery, and Simpson's arrest on that

warrant nine years later, in January 2012. Simpson, *pro se*, brings this action pursuant to 42

U.S.C. § 1983 against the Town of Warwick Police Department ("Warwick PD"), Detective

Gary Sisco, and Detective Mary Maslanka, alleging unlawful search and seizure, false arrest,

false imprisonment, malicious prosecution, and deliberate indifference to serious medical needs.

Defendants now move to dismiss Simpson's Second Amended Complaint ("SAC"), or,

alternatively, for summary judgment. For the reasons that follow, the Court grants the motion

for summary judgment in its entirety and dismisses this case.

I.      **Background**

A.      **Factual Background**[1]

1.      **The 2003 Robbery and Investigation**

On February 12, 2003, the Warwick PD received a call from one Gerard Degroat

reporting that he had been robbed.  Defs. 56.1, ¶ 20; Pl. 56.1, ¶ 20.  A Warwick police officer

was dispatched to the scene and, after interviewing Degroat, prepared an incident report.  Defs.

56.1, ¶ 20; Pl. 56.1, ¶ 20; *see* Maslanka Aff., Ex. A ("Incident Rep.").

The incident report states that Degroat had been backing out of a parking space on Main

Street in Warwick when he rear-ended a blue Jeep that had pulled up behind him.  Two black

men exited the Jeep and approached his vehicle.  The first was approximately six feet tall and

had braided hair emerging from the front of his cap.  The second was approximately 5'7" and

---

[1] The following facts are derived from (1) the parties' Local Rule 56.1 Statements of Facts, Dkt. 70 ("Defs. 56.1"); Dkt. 84 ("Pl. 56.1"); (2) the affidavits of Karen A. Jockimo, Dkt. 66 ("Jockimo Aff."), Mary Maslanka, Dkt. 67 ("Maslanka Aff."), Gary Sisco, Dkt. 68 ("Sisco Aff."), and James Feragola, Dkt. 69 ("Feragola Aff."), in support of defendants' motion for summary judgment, and attached exhibits; (3) the deposition of Simpson taken on March 30, 2015, Dkt. 87, Ex. A ("Simpson Depo."); (4) Simpson's declaration in opposition to defendants' motion, Dkt. 82 ("Pl. Decl."); and (5) Simpson's supplemental affidavit in opposition to that motion, Dkt. 91 ("Pl. Supp. Aff."), and an attached exhibit.  The Court also considers the facts set forth in Simpson's memorandum of law in opposition to defendants' motion for summary judgment, Dkt. 83 ("Pl. Br."), as well as those alleged in the SAC, Dkt. 30, which Simpson, in his deposition, attested was true and correct.  *See* Simpson Depo. 51–52; *Patterson v. Cty. of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) ("[A] verified pleading, to the extent that it makes allegations on the basis of the plaintiff's personal knowledge, . . . has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) ("[B]ecause plaintiff is *pro se*, we must consider as evidence in his opposition to summary judgment all of [his] contentions offered in motions and pleadings, where such contentions are based on personal knowledge and set forth facts that would be admissible in evidence, and where [plaintiff] attested under penalty of perjury that the contents of the motions or pleadings are true and correct."); *Gillard v. Rosati*, No. 08 Civ. 1104 (LEK) (DEP), 2011 WL 4402131, at *7 n.13 (N.D.N.Y. Aug. 22, 2011), *report and recommendation adopted*, 2011 WL 4344061 (N.D.N.Y. Sept. 14, 2011) (affording *pro se* plaintiff special solicitude and considering allegations contained in his verified amended complaint on motion for summary judgment).

also wore a cap.  The first threatened to shoot Degroat if he did not surrender his money.
Degroat gave the men $79, all the money he had, and drove away.  A few moments later, he
pulled over down the street and observed the men talking to a woman outside of Penra Liquor
Store ("Penra").  Degroat then returned to the scene and wrote down the license plate number of
the Jeep that his assailants had been driving.  Degroat went home to call the police.  Degroat's
wife called Angela Storms, who worked at Penra, to notify her of the robbery.  Incident Rep. 1–
2.

On February 13, 2003, Degroat provided a sworn statement confirming the information in
the incident report.  *See* Maslanka Aff., Ex. B.[2]  That day, the case was assigned to Maslanka, a
detective with the Warwick PD, for investigation.  *Id.* ¶ 6.  Upon receiving the incident report
and Degroat's statement, Maslanka ran the license plate number cited in the report through the
system and determined that the Jeep was owned by Trina DeLaura.  *Id.*  Later that day, Maslanka
obtained a sworn statement from Storms.  *Id.*; *see id.*, Ex. C.  Storms stated that on the previous
evening, "two black males" had come into the liquor store to buy wine and, while they were
paying, Degroat's wife called and informed her that the men had robbed her husband.  *Id.*, Ex. C,
at 1.  Storms also stated that when she returned home that evening, the two men were in her
home with her daughter, Heather Dalley.  *Id.*

On February 18, 2003, Maslanka obtained a statement from Dalley.  Maslanka Aff. ¶ 7;
*see id.*, Ex. D.  Sisco, Maslanka's partner, was present when Maslanka interviewed Dalley.
Sisco Aff. 1.  Dalley stated the following:  On February 12, 2003, Terrence Boone and Daniel
Simpson had come to her home in Newburgh, New York, and the three of them drove with

---

[2] Simpson points out in his 56.1 Statement that Degroat's sworn statement does not mention the
height of his assailants or that one of them had braids.  *See* Pl. 56.1, ¶ 21.  This omission is not
material, however, given Degroat's later identification of Simpson in the photo lineup.

Dalley's children to Penra in Boone's mother's car. Dalley bought a bottle of liquor from the store while Simpson, Boone, and Dalley's children waited in the car. Dalley then waited in the car with her children while Simpson and Boone went into the store. When they returned, Boone informed Dalley that a man had hit their car and given them money so that they would not call the police. The group then went to Storms's house. After receiving a few phone calls, Dalley's sister informed Dalley that someone had told her that Simpson and Boone had robbed Degroat. Boone denied the accusation, but Dalley's daughter told her that she had seen Simpson and Boone yelling at the man who hit the car. When Storms arrived home, Dalley left the house with her kids, Simpson, and Boone. Maslanka Aff., Ex. D, at 1–3.

On February 19, 2003, Maslanka obtained a voluntary statement from Boone. Maslanka Aff. ¶ 9; *see id.*, Ex. E. Sisco was present for the interview. Sisco Aff. 1. Boone confirmed that he had been with Simpson, Dalley, and Dalley's children on February 12, 2003. Maslanka Aff., Ex. E, at 1. He gave this account: While Dalley was in the liquor store, a man backed into the car in which Boone, Simpson, and Dalley's kids were seated. Simpson and Boone got out to inspect the damage, and Boone told the man that he was going to call the police. The man asked Boone not to do so, and offered him and Simpson $50 to cover the damage. Boone accepted the money and the group went to Dalley's mother's house before going home. *Id.* at 1–2.

Maslanka made several unsuccessful attempts to locate Simpson, but was able to obtain a photograph of him from his DMV records. Maslanka Aff. ¶¶ 10–11. Maslanka incorporated the photograph into a six-photo lineup, which she presented to Degroat. *Id.* ¶ 11; *see id.*, Ex. F, at 2. Degroat identified Simpson as the man who had robbed him. *Id.* ¶ 12; *id.*, Ex. F, at 1. Using a separate photo lineup, Degroat identified Boone as his other assailant. *See* Sisco Aff. 1–2.

Based on Degroat's identifications of Simpson and Boone, and the statements by Degroat, Storms, Dalley, and Boone, Maslanka prepared criminal complaints and requests for felony arrest warrants for Simpson and Boone.  Maslanka Aff. ¶ 13.  The Warwick Village Court issued warrants for both men's arrests.  Sisco Aff. 2.  Simpson's warrant charged him with petit larceny, in violation of N.Y. Penal Law § 155.25, and third-degree robbery, in violation of N.Y. Penal Law § 160.05.  *Id.*, Ex. A.  Simpson was not arrested at that time.  Rather, the warrant for his arrest was turned over to Warwick warrant control officers, who would then make efforts to locate him.  Sisco Aff. 2; Maslanka Aff. ¶ 13.  Sisco later arrested Boone.  Sisco Aff. 2.

### 2.      Simpson's January 7, 2012 Arrest and Subsequent Detention

On January 7, 2012,[3] at approximately 3 a.m., Simpson and his friend Rasheed Cook were leaving a diner in Kingston, New York, when Simpson hyperextended his left leg on the diner's front steps.  SAC ¶¶ 8–10; Simpson Depo. 58–61; Feragola Aff., Ex. A.  As Simpson and Cook walked away from the diner, they were approached by Kingston police officers.  SAC ¶ 10; Simpson Depo. 73–74.  The officers stated that they were investigating a complaint of a nearby disturbance and requested Simpson's and Cook's identification.  SAC ¶¶ 10–11; Simpson Depo. 74.  A search for their names in the officers' data information system revealed an outstanding warrant for Simpson's arrest for armed robbery in the Town of Warwick, and an outstanding misdemeanor arrest warrant for Cook.  SAC ¶ 12; Simpson Depo. 74, 79.

---

[3] Although the SAC and Simpson's deposition testimony indicate that the following events occurred on January 9, 2012, the arrest report states that they occurred on January 7, 2012.  *See* Feragola Aff., Ex. A.

The officers then[4] conducted a search of both men and found marijuana on Simpson's person.  SAC ¶ 11; Simpson Depo. 74.  Simpson and Cook were then placed under arrest and transported to the Kingston police station, where Simpson was given a fine for possession of marijuana.  SAC ¶ 13.

Upon being notified by the Kingston Police Department of Simpson's arrest, Officer James Feragola of the Warwick PD picked up Simpson and brought him to the Warwick police station.  Sisco Aff. 2; Feragola Aff. 1; *id.*, Ex. A.  Shackles were used to secure Simpson's ankles and wrists while in transit, but were removed upon his arrival at the station.  Simpson Depo. 86–88.  At the station, Simpson was placed in a cell where he remained for approximately three hours before being brought before the Warwick Village Court for arraignment.  *Id.* 87–88; Pl. 56.1, ¶ 47.  Simpson attests that despite his repeated complaints of "severe pain," Pl. 56.1, ¶ 48, the Warwick officers refused to bring him to the hospital, and told him that he could get medical attention only once he arrived at the jail, Simpson Depo. 62–63, 88.[5]

After his arraignment, Simpson was brought to the Orange County jail, where he was placed in a medical unit and given a wheelchair.  Simpson Depo. 63–64; SAC ¶¶ 14–15.  Simpson remained in jail for approximately two days before being released on bail.  Simpson Depo. 93; SAC ¶ 15.  Jailhouse officials gave Simpson crutches to take home upon discharge.  Simpson Depo. 63; SAC ¶ 15.

---

[4] The SAC states that the search occurred before Simpson's and Cook's names were run through the police database.  SAC ¶¶ 11–12.  However, in his deposition testimony, Simpson stated that the events occurred in the opposite order.  Simpson Depo. 74.  Construing the facts in the light most favorable to Simpson, the Court credits his latter account of the chronology.

[5] Defendants dispute these facts, noting that Feragola attests that Simpson never complained of pain or requested medical attention while in his custody.  *See* Feragola Aff. 2.

On January 13, 2012, Simpson went to St. Luke's Cornwall Hospital in Newburgh. Simpson Depo. 64; *see* Pl. Supp. Aff. 2.  After an X-ray, Simpson was informed that his leg was not broken and that "it didn't seem like there was anything real, real serious."  Simpson Depo. 65–66.  He was given a leg brace and pain medicine and told to keep his leg elevated.  *Id*. 65–66, 95; Pl. Supp. Aff. 2, 5.

On March 30, 2013, the Orange County District Attorney dismissed the charges against Simpson because he had not been arrested or indicted within the statutory time period set by N.Y. Crim. Proc. Law § 30.30.  Pl. Br. 5 (letter from ADA Kelly); Defs. 56.1, ¶ 56; Sisco Aff. 2.

### B.      Procedural History

On April 26, 2013, Simpson, proceeding *in forma pauperis*, filed a complaint against the State of New York, Orange County, the Warwick Village Court, and the Times Herald Record, alleging false arrest, false imprisonment, and defamation.  Dkts. 2, 4.  The case was assigned to the Honorable Loretta A. Preska, United States District Judge.  On June 17, 2013, Chief Judge Preska dismissed Simpson's complaint, which she "construed liberally as being brought under § 1983," for, *inter alia*, failure to state a claim.[6]  Dkt. 5, at 2–5.  She directed Simpson to file an amended complaint detailing his claims of false arrest and false imprisonment, and instructed him to name as defendants all individuals responsible for the alleged violations, and to describe how each defendant's acts or omissions violated his constitutional rights.  *Id*. at 6–7.

On July 2, 2013, Simpson filed an amended complaint against the Village of Warwick Police Department, the Times Herald Record, and two John Does, alleging false arrest, false imprisonment, and defamation.  Dkt. 6.  The amended complaint alleged that defendant "John

---

[6] Chief Judge Preska also noted that Simpson's claims against the Warwick Village Court must be dismissed pursuant to the Eleventh Amendment.  *Id.* at 3–4.

Doe of the [V]illage of Warwick Police Department" had prepared a report that was the basis for the issuance of Simpson's arrest warrant. *Id*. at 4.

On August 14, 2013, Chief Judge Preska dismissed all claims against the Times Herald Record, John Doe from the Times Herald Record, and, to the extent it was named as a defendant, the State of New York, Orange County. Dkt. 7, at 1–2. On August 21, 2013, Simpson's case was reassigned to this Court. On November 25, 2013, the Court directed the Clerk of Court to substitute the Warwick PD for the Village of Warwick Police Department as a defendant. Dkt. 14.

On February 26, 2014, pursuant to *Valentin v. Dinkins*, 121 F.3d 72 (2d Cir. 1997), the Court directed the Warwick PD to provide Simpson with the name and address of the "John Doe" police officer who prepared the police report referenced in Simpson's amended complaint, in order to effectuate service of that defendant. Dkt. 22. On March 18, 2014, counsel for the Warwick PD identified Maslanka and Sisco as the officers who prepared the report. Dkt. 25.

On May 5, 2014, Simpson filed the SAC. On May 28, 2014, the Honorable Gabriel W. Gorenstein, United States Magistrate Judge, amended the SAC's caption to add Maslanka and Sisco as defendants. Dkt. 35. On July 24, 2014, October 7, 2014, and October 23, 2014, the Warwick PD, Sisco, and Maslanka, respectively, answered. Dkts. 36, 45, 49.

During discovery, Simpson served defendants with requests for production of documents and interrogatories. *See* Dkts. 53, 54. On, March 30, 2015, defendants deposed Simpson by telephone. *See* Simpson Depo.[7] Discovery closed on March 30, 2015. *See* Dkt. 75.

---

[7] Simpson indicates in his sur-reply brief that he was not provided with a copy of his deposition before its completion, and thus did not review, verify, or sign it. Pl. Sur-reply Br. ¶ 5. However, he does not assert that the transcript contains any mistakes or otherwise seek to correct it. The court reporter who transcribed the deposition certified that the testimony contained therein had been "duly sworn to." Simpson Depo. 158.

On April 17, 2015, defendants moved to dismiss the SAC under Federal Rule of Civil Procedure 12(c), or, in the alternative, for summary judgment under Federal Rule of Civil Procedure 56(c). Dkt. 64. Along with that motion, defendants filed: (1) a Rule 56.1 Statement, Defs. 56.1; (2) a memorandum of law in support, Defs. Br.; (3) an affidavit by defense counsel, Jockimo Aff., and attached exhibits; (4) an affidavit by Maslanka, Maslanka Aff., and attached exhibits; (5) an affidavit by Sisco, Sisco Aff., and an attached exhibit; and (6) an affidavit by Feragola, Feragola Aff., and an attached exhibit. Defendants also filed a notice informing Simpson of the requirements for opposing a motion for summary judgment. Dkt. 72.

On May 6, 2015, Judge Gorenstein granted Simpson leave to submit an amended document request to defense counsel. Dkt. 80. On May 27, 2015, Simpson filed: (1) a declaration in opposition to defendants' motion, Pl. Decl.; (2) a Rule 56.1 Statement, Pl. 56.1; (3) a statement of disputed factual issues, Dkt. 85; and (4) a memorandum of law in opposition to defendants' motion, Pl Br. In his opposition brief, Simpson, for the first time, requested leave to add Feragola as a defendant. Pl. Br. 3.

On June 11, 2016, defendants replied, Defs. Reply Br., and filed a supplemental affirmation by counsel, Jockimo Supp. Aff., and an accompanying exhibit, as well as a counterstatement to Simpson's statement of disputed factual issues, Dkt. 88. On July 1, 2015, Simpson filed a supplemental affidavit, dated June 8, 2015. Pl. Supp. Aff. On July 2, 2015, Simpson mailed the Court and defense counsel a sur-reply brief, which was not filed on the docket. Pl. Sur-reply Br.

II.     **Applicable Legal Standards**

      A.     **Applicable Legal Standards for Motion for Summary Judgment**

Because the parties have completed discovery and because defendants' motion is based on evidence outside the pleadings, the Court treats the motion as one for summary judgment.

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a question of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

To survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

Where the non-movant is a *pro se* litigant, his submissions must be construed to "raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (internal quotation marks and citation omitted). However, this forgiving standard "does not relieve [a *pro se* party] of his duty to meet the requirements

necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003) (citation omitted).

### B.      Applicable Legal Standards for § 1983 Claims[8]

Section 1983 provides redress for a deprivation of federally protected rights by persons acting under color of state law.  42 U.S.C. § 1983.  To prevail on a § 1983 claim, a plaintiff must establish (1) the violation of a right, privilege, or immunity secured by the Constitution or laws of the United States (2) by a person acting under the color of state law.  *West v. Atkins*, 487 U.S. 42, 48 (1988); *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155–57 (1978).

#### 1.      Personal Liability Under § 1983

To establish personal liability under § 1983, a plaintiff must show that the defendant was "personally or directly involved in the violation, that is, that there was 'personal participation by one who ha[d] knowledge of the facts that rendered the conduct illegal.'"  *Harris v. Westchester Cty. Dep't of Corr.*, No. 06 Civ. 2011 (RJS), 2008 WL 953616, at *9 (S.D.N.Y. Apr. 3, 2008) (quoting *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001)); *accord Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." (internal quotation marks and citation omitted)).

Personal involvement in a § 1983 violation may be shown by evidence that the defendant: (1) directly participated in the alleged violation; (2) failed to remedy the violation after learning about it; (3) created a policy or custom under which the violation occurred; (4) was grossly negligent in supervising subordinates who caused the unlawful condition or event; or (5)

---

[8] In dismissing Simpson's initial complaint, Chief Judge Preska reviewed the legal standards governing both personal and municipal liability under § 1983.  *See* Dkt. 5, at 3.  As set forth below, Simpson has failed to cure the deficiencies identified in that decision.

exhibited deliberate indifference by failing to act on information indicating that the violation was

occurring.  *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995); *Washington v. Kelly*, No. 03 Civ.

4638 (SAS), 2004 WL 830084, at *3 (S.D.N.Y. Apr. 13, 2004).

### 2.    Municipal Liability Under § 1983

Municipal liability in a § 1983 action may not be based on a theory of *respondeat*

*superior* or vicarious liability.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).  Rather,

to hold a municipality liable under § 1983 for the unconstitutional actions of its employees, a

plaintiff must prove that there was a municipal policy or custom that directly caused the plaintiff

to be subjected to a constitutional violation.  *Wray v. City of New York*, 490 F.3d 189, 195 (2d

Cir. 2007); *see Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 125 (2d Cir. 2004)

("[C]onstitutional torts committed by city employees without official sanction or authority do not

typically implicate the municipality in the deprivation of constitutional rights, and therefore the

employer-employee relationship is in itself insufficient to establish the necessary causation."

(internal quotation marks and citation omitted)).

> A plaintiff can establish the existence of a policy or custom by demonstrating:
>
> (1) a formal policy officially endorsed by the municipality; (2) actions taken by
> government officials responsible for establishing the municipal policies that
> caused the particular deprivation in question; (3) a practice so consistent and
> widespread that, although not expressly authorized, constitutes a custom or usage
> of which a supervising policy-maker must have been aware; or (4) a failure by
> policymakers to provide adequate training or supervision to subordinates to such
> an extent that it amounts to deliberate indifference to the rights of those who come
> into contact with the municipal employees.

*Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (collecting cases)

(internal citations omitted); *Calderon v. City of New York*, No. 14 Civ. 1082 (PAE), 2015 WL

5802843, at *14 (S.D.N.Y. Oct. 5, 2015), *reconsideration in part granted on other grounds*,

2015 WL 6143711 (S.D.N.Y. Oct. 19, 2015); *Spears v. City of New York*, No. 10 Civ. 3461 (JG), 2012 WL 4793541, at *11 (E.D.N.Y. Oct. 9, 2012).

## III.    Discussion

The Court reads the SAC as raising five claims under § 1983: a Fourth Amendment claim based on an allegedly unlawful search of Simpson's person; false arrest, false imprisonment, and malicious prosecution[9] claims based on the issuance and execution of an allegedly invalid warrant for Simpson's arrest; and an Eighth Amendment claim for deliberate indifference to Simpson's medical needs.  Because the SAC does not specify which claims are brought against which defendants, the Court construes it liberally as bringing each cause of action against each named defendant.  *See Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2007) (the court is "obligated to construe a *pro se* complaint liberally").

The ensuing analysis proceeds as follows:  The Court first addresses which defendants may be sued for Simpson's § 1983 claims.  Specifically, the Court considers (1) whether it is proper to permit Simpson, at this late stage of the litigation, to add Feragola as a defendant, and (2) whether the Warwick PD may be sued as an entity separate from the Town of Warwick ("Warwick").  Having answered both questions in the negative, the Court then assesses the viability of Simpson's claims against the three properly pled defendants: Maslanka, Sisco, and Warwick.  For each claim, the Court considers first the personal liability of Maslanka and Sisco and then the municipal liability of Warwick.  The Court holds that, based on the undisputed facts, all three defendants are entitled to summary judgment on each claim.

---

[9] Simpson raises his malicious prosecution claim for the first time in opposing the motion for summary judgment.  However, as discussed below, because the SAC arguably gave defendants notice that Simpson might pursue such a claim, the Court considers it on the merits.

### A.      Proper Defendants

### 1.      Leave to Amend the SAC to Add a New Defendant

In his opposition brief, Simpson, for the first time, seeks leave to amend the SAC to join

Feragola as a defendant.  Pl. Br. 3.  The Court will not permit such joinder at this late stage.

A plaintiff's request to amend his complaint to add new defendants is governed by

Federal Rule of Civil Procedure 21, which permits the district court to add or drop a party "at

any time, on just terms."  Fed. R. Civ. P. 21; *see Sly Magazine, LLC v. Weider Publ'ns L.L.C.*,

241 F.R.D. 527, 532 (S.D.N.Y. 2007); *Momentum Luggage & Leisure Bags v. Jansport, Inc.*,

No. 00 Civ. 7909 (DLC), 2001 WL 58000, at *1–2 (S.D.N.Y. Jan. 23, 2001).  Under Rule 21, the

Court "must consider judicial economy . . . , as well as how the amendment would affect the use

of judicial resources, the impact the amendment would have on the judicial system, and the

impact [it] would have on each of the parties already named in the action."  *Momentum Luggage*,

2001 WL 58000, at *2.  The Court may deny leave to amend on the grounds, *inter alia*, of bad

faith, undue delay or prejudice to the opposing party, or futility of amendment.  *Mackensworth v.

S.S. Am. Merch.*, 28 F.3d 246, 251 (2d Cir. 1994) (collecting cases); *Sly Magazine*, 241 F.R.D. at

532 (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  "Leave to amend a complaint will

generally be denied when the motion to amend is filed solely in an attempt to prevent the Court

from granting a motion to dismiss or for summary judgment."  *Berman v. Parco*, 986 F. Supp.

195, 217 (S.D.N.Y. 1997) (internal quotation marks and citation omitted).

Here, it would be "unduly prejudicial to [defendants] for the Court to allow the addition

of [a] new defendant[] after submission of a fully briefed motion for summary judgment."

*Reynolds v. United States*, No. 06 Civ. 00843 (KMW) (DCF), 2007 WL 3071179, at *2

(S.D.N.Y. Oct. 19, 2007) (collecting cases); *see Beatty v. Charkravorty*, No. 93 Civ. 8900

(DLC), 1997 WL 605112, at *7 (S.D.N.Y. Oct. 1, 1997), *aff'd*, 165 F.3d 13 (2d Cir. 1998) (denying request to add new defendants where summary judgment was granted to original defendant); *Bymoen v. Herzog, Heine, Geduld, Inc.*, 88 Civ. 1796 (KMW), 1991 WL 95387, at *2 (S.D.N.Y. May 28, 1991) ("[A]mendment would be particularly prejudicial where discovery has already been completed and defendant has already filed a motion for summary judgment."). Doing so would necessarily force defendants to reopen discovery so that Feragola could seek discovery and prepare his defense. *See Sly Magazine*, 241 F.R.D. at 533. Moreover, the Court's determination, as follows, that Simpson has not established a viable claim against Feragola "renders the proposed joinder fundamentally beside the point." *Id.*

Simpson's motion for leave to add Feragola as a defendant is, therefore, denied.

### 2.    Claims Against the Warwick PD

Unlike Feragola, the Warwick PD is named as a defendant in the SAC. But Simpson cannot sustain *Monell* claims against that entity because, as an "administrative arm" of Warwick, it "do[es] not have a legal identity separate and apart from the municipality and cannot sue or be sued" in its own name. *Hall v. City of White Plains*, 185 F. Supp. 2d 293, 303 (S.D.N.Y. 2002) (collecting cases); *accord Polite v. Town of Clarkstown*, 60 F. Supp. 2d 214, 216 (S.D.N.Y. 1999) ("[M]unicipal departments in [New York] . . . are not amenable to suit, and no claims can lie directly against them.") (collecting cases).

Nonetheless, in light of Simpson's *pro se* status, and for the sake of completeness, the Court treats Simpson's claims against the Warwick PD as *Monell* claims against Warwick itself. *See Daly v. Ragona*, No. 11 Civ. 3836 (JFB), 2013 WL 3428185, at *10 (E.D.N.Y. July 9, 2013) (construing *pro se* plaintiff's claim against Nassau County Police Department as *Monell* claim against Nassau County). Warwick is not prejudiced by this approach because, as set forth below,

the lack of any evidence of a policy, practice, or custom underlying the alleged constitutional violations compels a grant of summary judgment for the town on each of Simpson's claims.

### B.    Simpson's Substantive Claims

Having determined which defendants are subject to suit, the Court now turns to the merits of Simpson's claims.

### 1.    Unlawful Search in Violation of the Fourth Amendment

The SAC first challenges the search of Simpson's person by Kingston police officers in the early morning hours of January 7, 2012.  Simpson claims he was searched without probable cause in violation of the Fourth Amendment.[10]  SAC ¶¶ 26–28.  Defendants argue that, even assuming *arguendo* the search was unjustified, this claim must be dismissed because Simpson has failed to allege facts that would allow a jury to conclude that Maslanka, Sisco, or any other Warwick official participated in the constitutional violation.  Defs. Br. 4–5; Defs. Reply Br. 5–6.  Defendants are correct.

Simpson does not dispute that the search was performed entirely by officers of the Kingston, not the Warwick, Police Department.  *See* Pl. 56.1, ¶ 46; Pl. Br. 2.  Nor does he allege that Maslanka, Sisco, or any other Warwick official directed the search or was present for it.  Instead, in his opposition brief, Simpson argues that the fact that "the warrant was invalid by virtue of the statute of limitations" is enough to "establish that defendants conducted an improper search of him after being detained by kingston [sic] police."  Pl. Br. 2.

This argument fails to salvage this claim.  Even if the arrest warrant issued by the Warwick PD in 2003 were supported by less than probable cause, that would not supply a basis

---

[10] While the cause of action is labeled "Breach of Duty to Protect Plaintiff's Fifth Amendment to the Constitution," the ensuing discussion refers only to Simpson's Fourth Amendment right to be free from search without probable cause.  *See* SAC ¶ 28.

to charge the named Warwick defendants for a search performed by a completely separate police department nine years later.  No facts have been elicited that establish the "personal involvement" of Maslanka, Sisco, Feragola, or, for that matter, any Warwick PD official, in the execution of the search as required for individual liability under § 1983.  *See Hicks v. City of Buffalo*, 124 F. App'x 20, 23–24 (2d Cir. 2004) (summary order) (sheriff who was not personally involved in allegedly unlawful search and seizure and was not present when plaintiff's apartment was entered could not be held liable under § 1983).  And, without an underlying violation by a Warwick official, there can be no municipal liability under § 1983.  *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (municipal liability requires that individual municipal agent committed an underlying constitutional violation).

All three defendants are, therefore, entitled to summary judgment on this claim.

### 2.     False Arrest and False Imprisonment

In its third cause of action, the SAC alleges that defendants "deprived [Simpson] of his liberty" by issuing an arrest warrant based on false and unsubstantiated information and arresting Simpson on the basis of that information.  SAC ¶ 36.  The Court construes the SAC to thereby claim false arrest and false imprisonment in violation of the Fourth Amendment.[11]

"A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law."  *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996), *cert. denied*, 528 U.S. 946 (1999) (internal citations omitted); *accord Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007).  Under New York law, a plaintiff bringing a

---

[11] Because the analyses for false arrest and false imprisonment are identical in this Circuit, *see Posr v. Doherty*, 944 F.2d 91, 96 (2d Cir. 1991), the Court addresses them together and refers to them collectively as Simpson's "false arrest claim."

claim for false arrest must show that "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) (quoting *Broughton v. State of New York*, 37 N.Y.2d 451, 456, *cert. denied*, 423 U.S. 929 (1975)).

An arrest is privileged where the arresting officer had probable cause to arrest. *See Jocks v. Tavernier*, 316 F.3d 128, 135 (2d Cir. 2003); *Jenkins*, 478 F.3d at 84 ("The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983." (internal quotation marks and citation omitted)).  Probable cause exists "when the arresting officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Lacey v. Daly*, 26 F. App'x 66, 67 (2d Cir. 2001) (quoting *Singer*, 63 F.3d at 119) (internal quotation marks omitted).

The validity of an arrest does not depend on an ultimate finding of guilt or innocence. *Pierson v. Ray*, 386 U.S. 547, 555 (1967); *Wiltshire v. Wanderman*, No. 13 Civ. 9169 (CS), 2015 WL 4164808, at *3 (S.D.N.Y. July 10, 2015) (that charges were later dropped is "irrelevant" to question of whether probable cause existed at time of arrest).  Rather, "[w]hen determining whether probable cause exists courts must consider those facts *available to the officer* at the time of the arrest." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (internal quotation marks and citation omitted) (emphasis in *Crowley*).  The Court may determine, as a matter of law, whether probable cause existed where there is no dispute as to the pertinent events and the knowledge of the arresting officers. *Weyant*, 101 F.3d at 852.

### a.    *Personal Liability of Maslanka and Sisco*

Defendants do not dispute that Simpson has established the first three elements of his false arrest claim.  They argue, however, that Maslanka and Sisco are entitled to summary judgment on this claim because there was probable cause for Simpson's arrest and detention. Defs. Br. 8–11; Defs. Reply Br. 7.  Defendants are correct.

It is undisputed that neither Maslanka nor Sisco played any role in executing the warrant or arresting Simpson in January 2012.  Rather, Maslanka's personal involvement in Simpson's arrest culminated in her preparation and submission of a criminal complaint and request for an arrest warrant in February 2003.  *See* Maslanka Aff. ¶¶ 13–14.[12]  Sisco's involvement ended earlier, as the undisputed facts show that, after joining Maslanka during witness interviews, he did not further participate in the investigation of Simpson or supply any information to the court that granted the warrant application.  *See* Sisco Aff. 1–2.[13]  Accordingly, in evaluating the personal liability of these officers, the Court need inquire only whether probable cause existed at the conclusion of the officers' investigation, when Maslanka sought (and obtained) a warrant for Simpson's arrest.

Simpson raises two arguments challenging the finding of probable cause at that time. Neither has merit.

First, Simpson claims that the statements from lay witnesses on which the arrest warrant was sought were "unsubstantiated," "false," and "inaccurate."  SAC ¶ 36.  But Simpson does not

---

[12] In fact, Maslanka had been retired for nearly four years by the time Simpson was arrested. Maslanka Aff. ¶ 14.

[13] Defendants argue that Sisco's limited involvement in the investigation cannot support a finding of personal liability under § 1983.  Defs. Br. 11–12.  Because the Court finds there was probable cause for the issuance of the warrant, it has no occasion to consider this argument.

dispute that (1) Degroat, the victim of the alleged robbery, gave police a sworn statement that he was forced to give money to "two black males" after he backed into their car, and that one of the men threatened to shoot him;[14] (2) Degroat picked Simpson out of a photo lineup as being "one of the persons who robbed [him]"; and (3) Storms, Dalley, and Boone, Simpson's childhood friend, all provided statements identifying Simpson as being at the scene of the alleged robbery.[15] *See* Pl. 56.1, ¶ 20–21, 24, 26–30, 32; Simpson Depo. 109.

These facts, which were uncontradicted in 2003 when the police sought and obtained the arrest warrant, easily supply probable cause to arrest Simpson for the crimes charged in the warrant: petit larceny, *see* N.Y. Penal Law § 155.25 ("A person is guilty of petit larceny when he steals property."), and third-degree robbery, *see* N.Y. Penal Law § 160.05 ("A person is guilty of robbery in the third degree when he forcibly steals property.").  Probable cause can be based solely on information obtained from an alleged victim or eyewitness to a crime.  *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000).  As the Second Circuit has stated, "probable cause exists if a law enforcement officer 'received [ ] information from some person, normally the putative victim or eyewitness, unless the circumstances raise doubt as to the person's veracity.'" *Betts v. Shearman*, 751 F.3d 78, 82 (2d Cir. 2014) (quoting *Panetta*, 460 F.3d at 395).

---

[14] Simpson is African American, Feragola Aff., Ex. A, 5'11 tall, Pl. 56.1, ¶ 22, and testified at his deposition that he had dreadlocks in 2003, Simpson Depo. 151.  Simpson's objection that Degroat's sworn statement does not reiterate his prior assertion, documented in the incident report, that one of his assailants was six feet tall, with braids coming out of his cap, *see* Pl. 56.1, ¶ 21, does not undermine Degroat's statement, especially given Degroat's later identification of Simpson in the photo lineup.  *See* Maslanka Aff., Ex. F.  And, Simpson's assertion in his 56.1 Statement that he did not have dreadlocks in 2003, Pl. 56.1, ¶ 23, is contradicted by Simpson's own deposition testimony.  *See* Simpson Depo. 151 ("I had dreads, short dreads [in 2003].").

[15] Contrary to Simpson's objections, the fact that Dalley's statement refers to "Daniel Simpson," as opposed to "Daniel Dervan Simpson," *see* Pl. 56.1, ¶ 30, does not lessen the evidentiary value of the identification.

20

Decisive here, Simpson has failed to point to any information available to Maslanka or Sisco at the time the warrant was sought that undermined the trustworthiness of Degroat, Storms, Dalley, or Boone.  He argues only that the information relied on by Maslanka and Sisco was "inaccurate," and must have been "falsified" by the Warwick PD, because at the time of the alleged robbery, Simpson had never "placed foot in . . . Warwick in his entire life."  SAC ¶ 34; Simpson Depo. 142–43.[16]  But even if that were true—and each witness had been mistaken or even lied about Simpson's identity—that would not negate probable cause because, based on the undisputed facts, the officers had no reason to doubt these witnesses' reliability.  *See Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994) ("[P]robable cause can exist even where it is based on mistaken information, so long as the arresting officer acted reasonably and in good faith in relying on that information."); *Weiner v. McKeefery*, 90 F. Supp. 3d 17, 33 (E.D.N.Y. 2015) (officers had no reason to doubt witness's reliability, "as it was established through his sworn statements and by the fact that his version of events was consistent with and corroborated by that of [another witness]"); *Rodriguez v. New York*, No. 95 Civ. 3639 (SHS), 1996 WL 197749, at *2 (S.D.N.Y. Apr. 23, 1996) (dismissing false arrest claim where plaintiff conceded that he was identified by two witnesses as the perpetrator of a robbery and "put forth no reason to doubt the veracity of these witnesses").

Second, in his opposition, Simpson argues, for the first time, that Maslanka and Sisco lacked probable cause to request a warrant for Simpson's arrest because they "shoul[]d have known that there was no possibility of prosecuting a case against [him] due to the [expiration of]

---

[16] *See also* Simpson Depo. 112 ("[The robbery] never happened.  I deny that.  Like I said, I was never in Warwick, New York prior to my arrest."); *id.* 142–43 ("I don't think that these witnesses stated this information. . . .  I feel that the Town of Warwick Police Department falsified this information on their own. . . . There's no way that those witnesses . . . could have said anything about Daniel Dervan Simpson.").

the statute of limitations."  Pl. Br. 2.[17]  But, even assuming that the relevant statute of limitations

had expired before Simpson's January 2012 arrest, it would have been impossible for Maslanka

or Sisco to have predicted in 2003, when the limitations period had just begun to run, that it

would take so long to apprehend Simpson.  Accordingly, the fact that the charges may later have

been dismissed on statute-of-limitations or speedy-trial grounds does not bear on whether

probable cause existed at the time Maslanka and Sisco participated in the process of obtaining an

arrest warrant.  *Cf. 5 Borough Pawn, LLC v. City of New York*, 640 F. Supp. 2d 268, 293–94

(S.D.N.Y. 2009) ("[T]he eventual disposition of a criminal charge does not vitiate the existence

of probable cause at the time the warrant was issued.  Plaintiffs' [sic] are required to offer the

court some evidence tending to show that [defendant] knew, at the time the warrant was

executed, that the statements supporting the warrant were false." (internal citation omitted)).

---

[17] Simpson bases this assertion on a letter from ADA Kelly, dated March 30, 2012, stating that "because there has been no Grand Jury action or arrest within the statutory period set forth in CPL 30.30, there is no possibility of prosecuting [Simpson's] case."  Pl. Br. 5.  In fact, N.Y. Crim. Proc. Law § 30.30 is New York's speedy-trial statute, whereas N.Y. Crim. Proc. Law § 30.10 sets forth the relevant limitations periods.  The latter provides that a prosecution for certain felonies, including third-degree robbery, *see* N.Y. Penal L. § 160.05, "must be commenced within five years after the commission thereof"; and a prosecution for a misdemeanor, including petit larceny, *see* N.Y. Penal L. § 155.25, "must be commenced within two years after the commission thereof," N.Y. Crim. Proc. Law § 30.10(2)(b)–(c).  However, subsection (4)(a) provides for the tolling of the limitations period where "the defendant was continuously outside this state or . . . the whereabouts of the defendant were continuously unknown and continuously unascertainable by the exercise of reasonable diligence."  N.Y. Crim. Proc. Law § 30.10(4)(a). While the Court has no occasion to determine whether tolling was merited here, it may have been:  Maslanka and Sisco attest that they were unable to locate Simpson in 2003, Maslanka Aff. ¶ 10; Sisco Aff. 2, and Simpson testified that he lived in California between 2003 and 2011, Simpson Depo. 14.

Simpson has, therefore, failed to raise an issue of fact as to whether Maslanka and Sisco had probable cause to seek a warrant for his arrest.  Maslanka and Sisco are thus entitled to summary judgment on this claim.[18]

### b.   *Municipal Liability of Warwick*

Because probable cause for Simpson's arrest existed at the time the warrant was issued in 2003, a *Monell* claim against Warwick predicated on the unlawful *issuance* of the warrant cannot stand.  *See Heller*, 475 U.S. at 799 (no municipal liability where plaintiff has "suffered no constitutional injury at the hands of [an] individual police officer"); *Wray*, 490 F.3d at 196 (granting summary judgment for city on *Monell* claim because officer's conduct did not deprive plaintiff of his constitutional rights); *Harper v. City of New York*, No. 11 Civ. 4333 (CM), 2013 WL 432599, at *4 (S.D.N.Y. Jan. 31, 2013) (dismissing *Monell* claim against city because probable cause existed for plaintiff's arrest).

As to Simpson's claim that the *execution* of his warrant in 2012 was unlawful due to the expiration of the statute of limitations, it, too, does not support a false arrest claim under *Monell*. The Court is not persuaded by Simpson's claim that the possible expiration of the statute of limitations barred the officers' finding of probable cause or made it wrongful for them to arrest Simpson based on the warrant.[19]  Because Simpson has failed to demonstrate that Feragola or

---

[18] Because there was probable cause to arrest Simpson, the Court need not consider defendants' alternative argument that Maslanka and Sisco are entitled to qualified immunity as to that claim. *See Cerrone v. Brown*, 246 F.3d 194, 202–03 (2d Cir. 2001) (officer entitled to qualified immunity on false arrest claim if there was "arguable probable cause" for the plaintiff's arrest, to wit, if "a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in the light of well established law") (internal quotation marks and citation omitted) (emphasis in *Cerrone*).

[19] Simpson does not cite case authority for this claim, and the law is to the contrary.  The Second Circuit has affirmed a holding that "the statute of limitations is neither an element of the crime,

any other Warwick official subjected him to an unlawful arrest, Warwick is entitled to summary judgment on this claim. *Heller*, 475 U.S. at 799; *Wiltshire*, 2015 WL 4164808, at *4 ("Because Plaintiff cannot establish a violation of his right to be free from false arrest, the City is entitled to summary judgment on Plaintiff's false arrest claim.").

Even assuming *arguendo* that Simpson had established that a Warwick police officer had violated his right to be free from false arrest, Simpson's *Monell* claim would still fail because he has submitted no evidence that the alleged constitutional violation resulted from a municipal policy, custom, or practice. Where a plaintiff alleges a single incident, especially one involving

---

nor a necessary component of probable cause, whether it be at the time of arrest or arraignment." *Sullivan v. LaPlante*, No. 03 Civ. 359 (OGS), 2005 WL 1972555, at *7 (N.D.N.Y. Aug. 16, 2005) (citing *People v. Kohut*, 30 N.Y.2d 183, 187–91 (1972)), *aff'd*, 175 F. App'x 484 (2d Cir. 2006) (summary order). Other circuit courts are in accord, holding that police officers are not obliged to determine whether the statute of limitations has expired before executing an arrest based on a facially valid warrant. For example, in *Pickens v. Hollowell*, the Eleventh Circuit held that police officers have no "duty to investigate and decide the potential viability of a . . . statute of limitations defense when executing a valid arrest warrant," and, therefore, cannot be held liable for false arrest on that ground. 59 F.3d 1203, 1207–08 (11th Cir. 1995). The Eleventh Circuit noted that the existence of a "statute of limitations defense . . . is not a cut and dry matter" in Georgia—*i.e.*, tolling occurs when the "accused is not usually and publicly a resident within" the state. *Id.* at 1208 (quoting Ga. Code Ann. § 17-3-2(1)). Similarly, the Third Circuit has held that because "the application of the limitations period is not a clear cut matter in criminal prosecutions," requiring police officers to know the intricacies of statutes of limitations is too great a burden. *Sands v. McCormick*, 502 F.3d 263, 269–70 (3d Cir. 2007); *see also Evans v. Nevada Cty. Sheriff's Dep't*, No. 13 Civ. 1775 (TLN), 2014 WL 6895569, at *11 (E.D. Cal. Dec. 8, 2014) (statute of limitations not a factor in determining probable cause); *Hanks v. Cty. of Delaware*, 518 F. Supp. 2d 642, 649–50 (E.D. Pa. 2007) (arresting officer had probable cause to arrest on 20-year old bench warrant where officer did not know it was invalid at time of arrest); *cf. Mitchell v. Aluisi*, 872 F.2d 577, 579 (4th Cir. 1989) (arrest based on recalled bench warrant did not violate plaintiff's constitutional rights where deputies were unaware of order withdrawing warrant). Notably, the statute of limitations for a criminal proceeding in New York is, similarly, not a "cut and dry" determination. As noted, it is tolled when the defendant is out of state or cannot be located by the exercise of reasonable diligence—circumstances which may, in fact, apply here. *See* N.Y. Crim. Proc. Law § 30.10(4)(a). As such, the Court finds that "[a]n arresting officer [would not have been] in a position to [determine]," on the spot, whether the prosecution of Simpson was time-barred. *Pickens*, 59 F.3d at 1208. Simpson's claim that the statute of limitations had expired, even if ultimately persuasive, would therefore not negate the lawfulness of his arrest based on a facially valid arrest warrant.

only actors below the policy-making level, that allegation is "not sufficient to impose liability

under *Monell*, unless proof of the incident includes proof that it was caused by an existing,

unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."

*Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985); *accord Parker v. City of Long Beach*,

563 F. App'x 39, 41–42 (2d Cir. 2014) (summary order), *as amended* (Apr. 21, 2014) (summary

judgment on *Monell* claims was proper where plaintiff "fail[ed] to establish that the individual

defendants' actions were the result of any municipal policy or failure to train, or that any of the

individual defendants exercised policymaking authority such that [a] single episode could

possibly be attributed to municipal authority").

Here, the SAC does not contain a single allegation—even a conclusory one—that a

policy or custom on the part of Warwick caused any of the alleged constitutional violations, and

no evidence to that effect was adduced in discovery.  The SAC does not so much as claim that

there was an official or *de facto* policy of executing stale arrest warrants, or that such a custom

may be inferred from repeated instances of similar misconduct.  Nor does the SAC allege that

Feragola, or any other official involved in the arrest, was a municipal policymaker.  Rather, in

his opposition brief, Simpson defends his *Monell* claims with the lone assertion that "[i]t was the

[Warwick PD's] responsibility to proper[]ly supervise their subordinates and it would not have

le[d] to this dilliberate [sic] indiffer[e]nce to my rights."  Pl. Br. 3.[20]

---

[20] In his sur-reply brief, Simpson further defends his *Monell* claims on the ground that "Detective
Maslanka[] clearly establishes in her testimony[] that the procedures she followed were
department policy."  Pl. Sur-reply Br. ¶ 15.  However, the only policies that Maslanka refers to in
her affidavit are those of (1) preparing an incident report after a crime is reported, and (2)
compiling six-photo lineups that contain the criminal suspect's photo.  *See* Maslanka Aff. ¶¶ 2,
11.  These policies are irrelevant to Simpson's *Monell* claim.

Inadequate supervision may serve as the basis for § 1983 liability only "where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a 'deliberate choice,' that acquiescence may 'be properly thought of as a city policy or custom that is actionable under § 1983.'" *Amnesty Am.*, 361 F.3d at 126 (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989) (internal quotation marks omitted)).  Deliberate indifference "may be inferred where 'the need for more or better supervision to protect against constitutional violations was obvious,' but the policymaker 'fail[ed] to make meaningful efforts to address the risk of harm to plaintiffs.'" *Cash v. Cty. of Erie*, 654 F.3d 324, 334 (2d Cir. 2011) (quoting *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995); *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007)); *accord Missel v. Cty. of Monroe*, 351 F. App'x 543, 546 (2d Cir. 2009) (summary order).

Here, Simpson has come forth with no evidence tending to prove, even circumstantially, that Warwick policymakers were faced with an obvious need for heightened supervision of police officers.  Simpson has not, for instance, pointed to a history of unlawful arrests, or a basis for inferring that the potential for false arrests would be lessened by increased training or supervision.  *See Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992) (deliberate indifference inquiry asks whether: (1) policymaker knew "to a moral certainty" that subordinates would confront a given situation; (2) situation presents difficult choice that would be made less challenging by training or supervision, or there is a history of employees mishandling situation; and (3) wrong choice by subordinates will frequently cause deprivation of constitutional rights).  Simpson's allegation that he was, on a single occasion, subject to an unlawful arrest is not enough to establish that any lapse on the part of Warwick policymakers "was the result of 'conscious choice' and not 'mere negligence.'"  *Cash*, 654 F.3d at 334 (quoting *Amnesty Am.*,

26

361 F.3d at 128); *see Jenkins*, 478 F.3d at 95 ("The mere fact that [plaintiff] was falsely arrested, without more, does not show that the City's training program is inadequate.").

Warwick is thus entitled to summary judgment on Simpson's false arrest claim on the alternative ground that Simpson has failed to demonstrate a municipal policy or custom that is actionable under § 1983.

### 3.    Malicious Prosecution

In his opposition to defendants' motion, Simpson asserts, for the first time, a malicious prosecution claim under the Fourth Amendment.  He claims that Warwick officials maliciously instituted criminal proceedings against him by arresting him and presenting him for arraignment despite the ostensible expiration of the statute of limitations for the crimes with which he was charged.  Pl. Br. 2–3.  Defendants argue that Simpson should not be permitted to assert new allegations for the first time in opposition to a summary judgment motion.  Defs. Reply Br. 1–4 (citing, *inter alia*, *Kearney v. Cty. of Rockland*, 373 F. Supp. 2d 434, 440–41 (S.D.N.Y. 2005) (rejecting allegations raised for first time in opposition to such a motion because "nothing in [plaintiff's] filing[s] put defendants on notice of this new allegation"); *Jackson v. Onondaga Cty.*, 549 F. Supp. 2d 204, 220 (N.D.N.Y. 2008) (prohibiting *pro se* plaintiff from raising new allegations in opposition to summary judgment because doing so would "deprive Defendants of the fair notice envisioned by Fed. R. Civ. P. 8"); *Rochester v. Blue Cross and Blue Shield*, No. 98 Civ. 2436 (ILG), 2000 WL 1052064, at *6 (E.D.N.Y. June, 27, 2000) (refusing to consider new allegation on motion for summary judgment because "a failure to assert a claim until the last minute will inevitably prejudice the defendant")).

Defendants are correct that neither the SAC nor Simpson's earlier complaints include a malicious prosecution claim, mention the statute of limitations for the crimes charged in the

warrant, or indicate that the expiration thereof vitiated probable cause for Simpson's arrest. *See* Defs. Br. 6 n.1; Pl. Reply Br. 2–3. Rather, as noted above, the SAC's false arrest claim (as in the prior complaints) is based entirely on the theory that the arrest warrant was issued on the basis of "false and inaccurate statements" by Degroat and the other witnesses. SAC ¶¶ 34, 36.

"A party generally may not 'assert a cause of action for the first time in response to a summary judgment motion.'" *LeBlanc v. United Parcel Serv.*, No. 11 Civ. 6983 (KPF), 2014 WL 1407706, at *17 (S.D.N.Y. Apr. 11, 2014) (quoting *Greenidge v. Allstate Ins. Co.*, 312 F. Supp. 2d 430, 436–37 (S.D.N.Y. 2004), *aff'd*, 446 F. 3d 356, 361 (2d Cir. 2006)); *see also Malmsteen v. Universal Music Grp., Inc.*, 940 F. Supp. 2d 123, 135 (S.D.N.Y. 2013) ("Because [Plaintiff] failed to include this claim in his Amended Complaint, instead raising it for the first time in opposition to summary judgment, it is waived.") (citing *Rojo v. Deutsche Bank*, 487 F. App'x 586, 588–89 (2d Cir. 2012) (summary order)). However, under Federal Rule of Civil Procedure 15(b), the Court may consider claims outside those raised in the pleadings "so long as doing so does not cause prejudice" to defendants. *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 569 (2d Cir. 2000). Accordingly, in contrast to claims that are "entirely new," claims that are "related to or are mere variations of previously pleaded claims . . . may be raised on a motion for summary judgment where the defendant was clearly on notice from the complaint and was not unfairly prejudiced." *Henry v. Metro. Transp. Auth.*, No. 07 Civ. 3561 (DAB), 2014 WL 4783014, at *10 (S.D.N.Y. Sept. 25, 2014) (internal quotation marks and citations omitted); *accord Ragusa v. Malverne Union Free Sch. Dist.*, 381 F. App'x 85, 89–90 (2d Cir. 2010) (summary order) (district court should have considered new claim where complaint "was sufficient to place defendants on notice that [plaintiff] intended to pursue such an argument").

28

Here, the Court is skeptical that allegations in the SAC were "sufficient to place defendants on notice that [Simpson] intended to pursue" a malicious prosecution claim, *Ragusa*, 381 F. App'x at 89.[21]  That such intent was not then evident is reflected in Judge Gorenstein's directive, pursuant to *Valentin*, that defendants provide Simpson with the identity and contact information of the "officer who signed a complaint, report, or affidavit to obtain the warrant for [Simpson's] arrest"—*not* the officer who executed the warrant almost a decade later.  Dkt. 22. The Court need not definitively decide this issue, however, because a malicious prosecution claim, even if it had been properly pleaded in the SAC, plainly could not stand against any of the defendants.

To succeed on a malicious prosecution claim under § 1983, a plaintiff must establish the elements of a malicious prosecution claim under New York state law, as well as a violation of his rights under the Fourth Amendment.  *Manganiello v. City of New York*, 612 F.3d 149, 160–61 (2d Cir. 2010).  Accordingly, the plaintiff must show that: (1) the defendant commenced or continued a criminal proceeding against the plaintiff; (2) the proceeding was terminated in the plaintiff's favor; (3) there was no probable cause for commencing the proceeding; (4) the proceeding was instituted with "actual malice"; and (5) there was a post-arraignment liberty restraint sufficient to implicate the plaintiff's Fourth Amendment rights.  *McKay v. City of New York*, 32 F. Supp. 3d 499, 511 (S.D.N.Y. 2014) (quoting *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000) (internal quotation marks omitted)); *accord Droz v. McCadden*, 580 F.3d 106, 109 (2d Cir. 2009); *Drummond v. Castro*, 522 F. Supp. 2d 667, 677 (S.D.N.Y. 2007). As with false arrest, "the existence of probable cause is a complete defense to a claim of

---

[21] The only allegation in the SAC that conceivably bears on this claim is the assertion that the crimes with which Simpson was charged were "committed (10) ten years" before his arrest.  *See* SAC ¶ 22.

malicious prosecution in New York." *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003) (citation omitted).

### a. Personal Liability of Maslanka and Sisco

As noted above, Simpson has not alleged, much less adduced evidence, that Maslanka or Sisco participated in any way in the execution of the arrest warrant or Simpson's arraignment in 2012. To the contrary, the record indicates that any involvement of Maslanka and Sisco in Simpson's prosecution ceased when Maslanka prepared the criminal complaint and request for an arrest warrant in 2003. *See* Maslanka Aff. ¶¶ 13–14; Sisco Aff. 1–2. At that time, the alleged facts underlying Simpson's claims of malice—namely, the ostensible expiration of the statute of limitations on the petit larceny and robbery charges, and the officers' presumed knowledge that these crimes could no longer be successfully prosecuted—did not yet exist. There was therefore probable cause to arrest Simpson and no legal impediment to doing so. Moreover, Simpson has adduced no evidence that either officer later developed cause to believe that Simpson, if arrested on the outstanding warrant, would be subject to an unconstitutional arrest.

The undisputed facts, therefore, do not support a finding that Maslanka or Sisco was personally involved in any malicious commencement of a criminal proceeding against Simpson. Maslanka and Sisco are thus entitled to summary judgment on this claim. *See Carthew v. Cty. of Suffolk*, 709 F. Supp. 2d 188, 195 (E.D.N.Y. 2010) (police commissioner could not be sued on malicious prosecution claim where plaintiff did not allege commissioner was personally involved in plaintiff's prosecution); *Weiner*, 90 F. Supp. at 46–47 (defendant was entitled to summary judgment on malicious prosecution claim because there was no evidence that she initiated or participated in the continuation of plaintiff's prosecution).

### b. Municipal Liability of Warwick

Like his false arrest claim, Simpson's malicious prosecution claim against Warwick fails on the dual grounds that Simpson has not established (1) a constitutional violation by any Warwick official, or (2) a municipal policy or custom that caused the alleged violation.

First, while it is undisputed that a criminal proceeding was instituted against Simpson and that this proceeding terminated in his favor, Simpson has not adduced any evidence that proves the third and fourth elements of his malicious prosecution claim. To support his claim, Simpson relies entirely on the letter of ADA Kelly, which states that "because there ha[d] been no Grand Jury action or arrest within the statutory time period set forth in CPL 30.30, there [was] no possibility of prosecuting" Simpson for the crimes charged in the warrant. Pl. Br. 5.[22] But, for the reasons reviewed above, the prosecutor's later determination that the statute of limitations had expired did not make Simpson's arrest on a facially valid warrant unlawful.

Moreover, the record is devoid of evidence supporting a finding that Feragola or any officer who participated in Simpson's arrest or arraignment did so with actual malice. Under New York law, malice means "that the defendant must have commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served." *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 573 (2d Cir. 1996), *amended* (May 21, 1996) (quoting *Nardelli v. Stamberg*, 44 N.Y.2d 500, 502–03 (1978)). ADA Kelly's statement that "due diligence in executing the warrant was [not] exercised [until] . . . two years from the commencement of the criminal action," *see* Pl. Br. 5, does not support such a finding. To the contrary, the statement indicates only that warrant control officers began making efforts to

---

[22] As noted, it is N.Y. Crim. Proc. Law § 30.10, not § 30.30, that sets forth the applicable limitations periods: five years for third-degree robbery and two years for petit larceny.

execute the warrant well within the five-year statute of limitations period for the robbery charge. And, decisive here, Simpson has offered no evidence—nor even alleged—that Feragola or any other officer knew that the limitations period had expired, or had any other reason to doubt that Simpson could be successfully prosecuted for the crimes charged. Accordingly, "the inferential leap from a[n alleged] lack of probable cause to a lack of belief in the guilt of the accused, much less to malice, would be improper." *Pinter v. City of New York*, 976 F. Supp. 2d 539, 559 (S.D.N.Y. 2013) (malice requirement not satisfied where plaintiff offered no evidence that officers doubted plaintiff's guilt).

Because Simpson has not shown that he was maliciously prosecuted, his claim of municipal liability is, *a fortiori*, meritless. *See Harper*, 2013 WL 432599, at *2 (*Monell* claim could not stand where plaintiff failed to state a claim for false arrest or malicious prosecution against any individual). And, even if Simpson had shown that a Warwick police officer violated his right to be free from malicious prosecution, his *Monell* claim would still fail because there is no record evidence on which to infer a policy or custom on the part of Warwick of executing stale arrest warrants. Warwick is thus entitled to summary judgment on this claim, as well.

### 4. Deliberate Indifference to Serious Medical Needs

Finally, the SAC raises an Eighth Amendment claim for deliberate indifference to serious medical needs, based on defendants' failure to provide Simpson with adequate treatment while he was in the custody of the Warwick PD. SAC ¶¶ 29–32. Defendants correctly point out that the Eighth Amendment applies only to convicted prisoners, whereas claims by pretrial detainees like Simpson are properly brought under the Fourteenth Amendment. Defs. Br. 21; *see Caiozzo v. Koreman*, 581 F.3d 63, 69 (2d Cir. 2009) ("[A] claim for indifference to the medical needs of . . . a pretrial detainee in state custody [is] properly brought under the Due Process Clause of the

Fourteenth Amendment.").  In his opposition, Simpson concedes that his cause of action derives from the Due Process Clause of the Fourteenth Amendment.  Pl. Br. 3.  This distinction does not change the substantive analysis applicable to Simpson's claim, however:  "Claims for deliberate indifference to a serious medical condition or other serious threat to the health or safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment."  *Caiozzo*, 581 F.3d at 72; *see also Brown v. Mullen*, No. 12 Civ. 734 (PAE), 2013 WL 796530, at *4 n.6 (S.D.N.Y. Mar. 4, 2013).

The Eighth Amendment protects prisoners from "cruel and unusual punishment" caused by prison officials.  U.S. Const. amend. VIII.  But not every claim of inadequate medical care by an arrestee rises to the level of a constitutional violation.  *Estelle v. Gamble*, 429 U.S. 97, 105 (1976).  To establish an Eighth (or Fourteenth) Amendment violation arising out of inadequate access to medical care, "a prisoner must prove 'deliberate indifference' to [his] serious medical needs.'"  *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Estelle*, 429 U.S. at 104).

This standard incorporates both objective and subjective elements:  The objective component requires that "the alleged deprivation [ ] be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists."  *Hathaway v. Coughlin*, 99 F.3d 550, 554 (2d Cir. 1996) (internal quotation marks and citation omitted).[23]  The subjective component requires that "the charged official [ ] act with a

---

[23] Courts in this Circuit have considered various factors in determining the existence of a serious medical condition, including: (1) the "existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment"; (2) "the presence of a medical condition that significantly affects an individual's daily activities"; (3) "the existence of chronic and substantial pain"; and (4) "adverse medical effects or demonstrable physical injury." *Chance*, 143 F.3d at 702; *Smith v. Carpenter*, 316 F.3d 178, 187 (2d Cir. 2003).

sufficiently culpable state of mind," *i.e*., "with deliberate indifference to inmate health."

*Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (citing *Wilson v. Seiter*, 501 U.S. 294,

300 (1991)).  Accordingly, a plaintiff must show "the charged official act[ed] or fail[ed] to act

while *actually aware* of a substantial risk that serious inmate harm [would] result."  *Id.*

(emphasis added).

### a.  Personal Liability of Maslanka and Sisco

Maslanka and Sisco are entitled to summary judgment on Simpson's deliberate

indifference claim because, as stated above, the record shows that neither officer participated in

in Simpson's arrest or detention at the Warwick police station or Orange County jail.  As such,

there is no reason to believe that either officer was personally involved in, or even aware of, any

alleged deprivation of medical care.  Without evidence of personal involvement, a claim for

damages under § 1983 cannot stand against these defendants.  *See Farrell*, 449 F.3d at 484;

*Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994); *Williams v. Smith*, 781 F.2d 319, 323 (2d Cir.

1986).

### b.  Municipal Liability of Warwick

Simpson's deliberate indifference claim against Warwick fails for two independent

reasons: (1) Simpson has not shown that any Warwick official violated his right to

constitutionally adequate medical treatment; and (2) he has not adduced (or even alleged)

evidence of a Warwick policy or custom of providing, or condoning the provision of, inadequate

medical care to detainees.

As an initial matter, Simpson has failed to raise a genuine issue of material fact as to

whether he suffered a sufficiently severe medical deprivation—the objective prong of his

deliberate indifference claim.  He alleges that immediately prior to his arrest, he hyperextended

his left leg, causing him to experience considerable pain.  SAC ¶¶ 9, 10; Simpson Depo. 59–62.

He testified that during the three hours he was detained before his arraignment, Warwick police

officers refused to take him to the hospital, despite his complaints that his "leg hurts really bad."

Simpson Depo. 62–63; *see also* Pl 56.1, ¶¶ 47–48 ("[P]laintiff made constant complaints to . . .

Warwick officers of his severe pain and was ignored of his cries also plaintiff was clearly in pain

as he coul[]d not even walk.").  He argues that this delay in treatment constituted "negligen[ce]

to [his] severe medical need," and "increased the affect [sic] of his injury."  Pl. Br. 3; Pl. 56.1,

¶ 50.

Simpson further argues that the treatment he received at the Orange County jail—housing

in a medical dormitory, a wheelchair for the duration of his detention, and crutches upon

release—was inadequate and exacerbated his suffering.  Simpson Depo. 64; Pl. Br. 3–4; Pl. 56.1,

¶ 51.  In support, Simpson has submitted hospital records dated January 14, 2012, which indicate

that, shortly after his release from the jail, Simpson was prescribed pain medication and

instructed to keep his leg elevated, avoid physical exertion, and follow up with an orthopedist.

Pl. Supp. Aff. 2, 5.  Simpson admits, however, and the records confirm, that his leg was not

fractured or dislocated, Simpson Depo. 65; Pl. Supp. Aff. 4, and that he was told that the X-ray

did not reveal "anything real, real serious," Simpson Depo. 66.

These facts, even construed in the light most favorable to Simpson, do not rise to the

level required to implicate the Eighth or Fourteenth Amendments.  Courts in this Circuit have

found no "serious medical need" in injuries complained of that were similar to or more serious

than the injuries Simpson alleges.[24]  And "[n]umerous cases involving analogous injuries and

---

[24] *See, e.g.*, *Chatin v. Artuz*, 28 F. App'x 9, 10 (2d Cir. 2001) (summary order) ("[S]prained ankle, a bone spur, and a neuroma, did not rise to the level of seriousness that the Eighth Amendment requires."); *Henderson v. Doe*, No. 98 Civ. 5011 (WHP), 1999 WL 378333, at *2

delays substantially longer than those involved here have held that a deliberate indifference

claim does not lie in the absence of a serious medical need resulting from the delay." *Johnson v.*

*City of New York*, No. 12 Civ. 8265 (LAK) (HBP), 2014 WL 5393181, at *6 (S.D.N.Y. Oct. 21,

2014), *report and recommendation adopted*, 2014 WL 6455162 (S.D.N.Y. Nov. 17, 2014)

(collecting cases).[25]

      Although the Court credits Simpson's assertion that he was in "excruciating pain,"

Simpson Depo. 66, "it is the particular risk of harm faced by the Plaintiff due to a challenged

deprivation of care, rather than the severity of [his] underlying medical condition . . . that is

relevant." *Cain v. Jackson*, No. 05 Civ. 3914 (LAP), 2007 WL 2193997, at *6 (S.D.N.Y. July

27, 2007) (citing *Smith*, 316 F.3d at 186). Here, Simpson concedes that he was given a

wheelchair and placed in a medical dormitory upon his arrival at the Orange County jail.

Simpson Depo. 63–64; SAC ¶¶ 14–15. And he has adduced no evidence for his conclusory

allegation that the three-hour delay in treatment while awaiting arraignment materially

exacerbated his injury. *See Bilal v. White*, 494 F. App'x 143, 145–46 (2d Cir. 2012) (summary

order) ("Even assuming that [plaintiff's] conditions could produce serious complications if

neglected over sufficient time, there is no evidence that [plaintiff's] conditions worsened over the

---

(S.D.N.Y. June 10, 1999) (broken finger not a severe injury); *Veloz v. New York*, 35 F. Supp. 2d
305, 312 (S.D.N.Y. 1999) (pain from foot fracture, bone cyst, and degenerative arthritis not
sufficiently serious); *Alston v. Howard*, 925 F. Supp. 1034, 1040 (S.D.N.Y. 1996) (chronic ankle
arthritis not serious medical condition).

[25] *See, e.g.*, *Chatin*, 28 F. App'x at 10 (two-day delay in X-raying injured ankle, and failure to
provide plaintiff immediately with crutches, not enough to satisfy objective element); *Patterson
v. Westchester Cty.*, No. 13 Civ. 194 (PAC) (AJP), 2014 WL 1407709, at *7–8 (S.D.N.Y. Apr.
11, 2014), *report and recommendation adopted*, 2014 WL 2759072 (S.D.N.Y. June 16, 2014)
(dismissing deliberate indifference claim where plaintiff who tore ligaments in his ankle playing
basketball was not X-rayed for three days or issued crutches for 11 days); *Poindexter v. Davis*,
11 Civ. 2928 (PKC), 2012 WL 5465465, at *5 (S.D.N.Y. Nov. 9, 2012) (six-hour delay in
treating hand fracture did not satisfy objective element).

hours of delay here." (internal citation omitted)); *Johnson*, 2014 WL 5393181, at *9 (objective element not satisfied where plaintiff did not show "any adverse consequence resulting from the temporary deprivation of crutches"). The undisputed facts thus present a far cry from those in which courts have found a temporary delay in treatment to rise to the level of a constitutional violation.[26]

As to Simpson's claim that the treatment he received at the Orange County facility was insufficient,[27] this too does not bespeak a serious deprivation. At most, this allegation reflects "disagreement over [ ] proper treatment[, which] does not create a constitutional claim. So long as the treatment given is adequate, the fact that that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance*, 143 F.3d at 703; *cf. Estelle*, 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."). Here, there is no basis for concluding that providing a wheelchair to Simpson during his three-day stay at the jail was constitutionally deficient care. Simpson has, therefore, failed to satisfy the objective prong of his deliberate indifference claim.[28]

---

[26] *See e.g.*, *Salahuddin*, 467 F.3d at 281 (presuming that objective prong is satisfied by five-month delay in treatment for Hepatitis C); *Chance*, 143 F.3d at 702 (same, where six-month delay in treatment for dental condition led to degeneration, infection, and extreme pain); *Hathaway*, 37 F.3d at 67 (same, where two-year delay in treatment of broken pins in inmate's hip caused persistent pain).

[27] *See* Simpson Depo. 64 ("I wasn't seen by the medical staff. . . . [T]hey put me in a wheelchair, and then they put me in a medical dorm. I wasn't seen by any professional. . . . They didn't really give me medical attention at the jail."); Pl. Br. 3 ("[T]he medical unit [I] was placed in while in the Orange [C]ounty jail was not medical attention. [I] ne[e]ded a brace to stabilize [my] leg injury & relieve [my] pain w[h]ich [I] was denied by defendants.").

[28] Because Simpson's treatment at the Orange County jail did not violate the Eighth or Fourteenth Amendments, the Court has no occasion to consider whether employees of the jail are Warwick officials for the purpose of ascribing *Monell* liability.

Even if Simpson had shown that he was subject to a serious deprivation, his claim would fail because he has not demonstrated that any Warwick police officer or prison official acted with the "sufficiently culpable state of mind." *Hathaway*, 99 F.3d at 553. Simpson testified at his deposition that, despite his "consistent[ ] complain[ts]" of pain during his transport to, and detention at, the Warwick police station, he was told that he could not receive medical attention until he went to the Orange County jail. Simpson Depo. 83, 88. Moreover, he testified, the officers who transported him from Kingston to Warwick required him to wear shackles on his ankles and wrists because they believed that he was "faking" his injury. *Id*. at 89. Finally, he claimed, the officers required him to walk up the steps to the courthouse for his arraignment even though he "barely could walk." *Id*. at 63. Defendants deny that Simpson notified any Warwick officers about his pain, Defs. Br. 22–23, pointing to Feragola's attestation that "[a]t no time while . . . Simpson was in [his] custody did he complain of pain or request medical attention," Feragola Aff. 2. But, even crediting Simpson's version of the facts, a reasonable factfinder could not find that Feragola or any other Warwick official "kn[e]w of and disregard[ed] an excessive risk to [Simpson's] health or safety." *Hathaway*, 37 F.3d at 66.

Decisive here, Simpson has offered no proof that any officer was actually aware of the severity, if any, of his injury. In fact, he admits that the swelling in his leg was not visible when he was at the Warwick police station, and that the officers believed he was faking his injury. Simpson Depo. 85, 89. Under these circumstances, the officers could have reasonably concluded that a three-hour delay in treatment would not pose an undue risk to Simpson's health.[29] "In

---

[29] *See Johnson*, 2014 WL 5393181, at *9 (deliberate indifference not established where, although "officers who had custody of plaintiff were, no doubt, aware that plaintiff had suffered an ankle injury that caused him pain, . . . there was nothing about plaintiff's condition that suggested more prompt treatment was necessary"); *Linden v. Westchester Cty.*, No. 93 Civ. 8373 (MBM), 1995 WL 686742, at *3 (S.D.N.Y. Nov. 20, 1995) (eight-hour delay in permitting plaintiff to go to

light of the absence of any indication that more prompt treatment was necessary and the

relatively minor delay before the officers brought [Simpson] to [the jail where he received

treatment], no reasonable jury could conclude that the police officers delayed providing

[Simpson] treatment with the subjective recklessness necessary to satisfy the subjective element

of a deliberate indifference claim." *Johnson*, 2014 WL 5393181, at *9; *see also Doumin v.*

*Carey*, No. 06 Civ. 1119 (NPM), 2008 WL 4241075, at *6 (N.D.N.Y. Sept. 12, 2008) ("While it

is undisputed that Plaintiff was not provided medical care [for his ankle injury] until two days

after he first requested it, there is no evidence in the record that . . . defendants . . . 'deliberately

delayed care as a form of punishment.'" (quoting *Freeman v. Strack*, 99 Civ. 9878 (AJP), 2000

WL 1459782, at *6 (S.D.N.Y. Sept. 29, 2000)).

---

prison infirmary "suggests at most negligence," and is "insufficient to state a claim under
§ 1983"); *see also Ricks v. O'Hanlon*, 07 Civ. 9849 (WHP), 2010 WL 245550, at *8 (S.D.N.Y.
Jan. 19, 2010) ("Even crediting [plaintiff]'s version of the facts, he received medical treatment
[for a laceration and broken wrist] from EMS personnel and hospital medical staff within two or
three hours of his arrest.  This does not rise to the level of deliberate indifference."); *Simmons v.*
*Artuz*, No. 94 Civ. 6777 (DLC), 1996 WL 233504, at *4 (S.D.N.Y May 8, 1996) (plaintiff's
injuries were treated with "sufficient speed" when he was injured in the morning and treated by
evening-duty nurse).

    Moreover, Simpson's testimony that he was required to walk up steps to the courthouse
does not support a finding that any officer intentionally engaged in conduct to exacerbate
Simpson's pain or injury.  *Compare Covington v. Westchester Cty. Jail*, No. 96 Civ. 7551 (SAS),
1997 WL 580697, at *3 (S.D.N.Y. Sept. 18, 1997) (plaintiff raised issue of fact as to subjective
prong where he alleged that officials "forced him to work without crutches and intentionally
interfered with his prescribed medical treatment by confiscating his crutches and cane without
cause"); *with Walker v. Butler*, 967 F.2d 176, 178 (5th Cir.1992) (per curiam) (requiring prisoner
with two ankle fractures to walk to hospital did not constitute deliberate indifference to medical
needs); *and Wandell v. Koenigsmann*, No. 99 Civ. 8652 (WHP), 2000 WL 1036030, at *4
(S.D.N.Y. July 27, 2000) (deliberate indifference not shown where plaintiff did "not allege[] a
situation where defendants maliciously took away crutches that a doctor had already prescribed
. . . .  The fact that plaintiff believes he should have been prescribed crutches earlier, *i.e.*,
immediately, may state a claim for medical malpractice, but does not rise to the level of a
constitutional violation").

Simpson's failure to demonstrate a violation of his Eighth or Fourteenth Amendment rights by any Warwick official necessarily defeats his claim of municipal liability. *See Ferguson v. Cai*, No. 11 Civ. 6181 (PAE), 2012 WL 2865474, at *6 (S.D.N.Y. July 12, 2012). Warwick is, therefore, entitled to summary judgment on this claim.[30]

## CONCLUSION

For the foregoing reasons, the Court grants defendants' motion for summary judgment in its entirety. The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this order would not be taken in good faith, and therefore, *in forma pauperis* status is denied for purposes of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444–45 (1962). The Clerk of Court is respectfully directed to enter judgment in accordance with this Order and to close this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: February 4, 2016
      New York, New York

---

[30] Furthermore, as with Simpson's other claims, even if Simpson had shown that he was subject to a constitutional violation, his *Monell* claim would fail because he has adduced no facts indicative of a policy or custom that caused his injury. *See Mahone v. City of New York*, No. 13 Civ. 8014 (PAE), 2014 WL 1407702, at *6 (S.D.N.Y. Apr. 11, 2014) (allegations that, on two instances, officers denied plaintiff a wheelchair, made him walk on injured leg, and refused to supply him with extra pillows to elevate leg, not enough to find city had policy, practice, or custom of behaving with deliberate indifference to inmates' medical needs); *Ferguson*, 2012 WL 2865474, at *6 (single deficiency in medical treatment of prisoner was insufficient to establish official municipal policy).